STATE OF VERMONT

| SUPERIOR COURT | CIVIL DIVISION |
| --- | --- |
| Rutland Unit | Docket # 157-3-15 Rdcv |

IN RE:
SERGIO MENDEZ

FILED

APR 2 8 2016

VERMONT SUPERIOR COURT
RUTLAND

Petition for Post Conviction Relief

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

A hearing on the merits took place on November 17, 2015. Petitioner Sergio Mendez was represented by Attorney Dawn Matthews, and he participated by Skype. Attorney John G. D. Waszak represented the Rutland County State's Attorney. Post trial memoranda were filed.

Petitioner, a citizen of the Dominican Republic, seeks to have his June 2013 conviction for felony aggravated domestic assault, which was based on a plea and which resulted in his deportation, vacated due to ineffective assistance of counsel on the grounds that his attorney did not sufficiently explore alternative pleas or sentences that would have lessened the likelihood of deportation.

On January 11, 2016, the court, having learned from a post-hearing memorandum that there was a pending appeal related to the conviction, questioned the basis for deciding this post conviction relief action prior to the conclusion of the direct appeal. The Vermont Supreme Court subsequently affirmed the conviction on the direct appeal. See *State v. Mendez*, 2016 VT 24. That issue is now moot, and this decision is now issued.

Based on the evidence, the Court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

Petitioner came to this country from the Dominican Republic with his family in 1992 when he was 12 years old. He was raised in Massachusetts, where he attended school and grew up with both his immediate and extended family. His immigration status was as a legal permanent resident. He had one scrape with the law when he was a teenager resulting in a charge of resisting arrest but the charge was dropped. Most of his close and extended family members continue to live in Massachusetts, including his children. Prior to the conviction in this case, he was working in Ayer, Massachusetts.

1

In May of 2013 he was visiting in Vermont and was arrested after an altercation with his girlfriend. He was charged with felony aggravated domestic assault and held for lack of bail in Docket No. 811-5-13 Rdcr. He was eager to get out of jail and back to work in Massachusetts. He retained attorney James Valente to represent him. Mr. Valente did not meet with him in jail, but spoke with him on the telephone. Mr. Valente understood that he was not a citizen, and that he was eager to get out of jail.

Deputy State's Attorney Peter Bevere was the prosecutor assigned to the case. Mr. Valente spoke with Mr. Bevere and learned that Mr. Bevere was committed to obtaining a plea on the felony aggravated domestic assault charge. Mr. Valente knew that a felony domestic violence conviction would be grounds for deportation. He wanted to know the immigration effect of a misdemeanor domestic assault conviction as an alternative. He made two telephone calls to obtain this information. He first called an immigration attorney who could not help him with consequences of a criminal matter. He then called a telephone number in Massachusetts for information about criminal case immigration matters. He does not recall whom he called but believes that the telephone number was sponsored by either Catholic Charities or the Public Defender in Massachusetts. He learned that any plea to a domestic assault, whether a felony or misdemeanor, would make a non-citizen deportable. His investigation ended there. He did no further investigation into possibilities of avoiding or minimizing the chances of deportation through pleas to other possible amended charges.

Mr. Valente called Mr. Mendez at the jail and told him that the plea proposal of the State would make him deportable. They "did not get into the weeds of the deportation issue" even though to Mr. Valente "it seemed that he did not take seriously the threat of deportation." Mr. Mendez was focused on getting out of jail.

Mr. Bevere offered an agreement to a sentence of 18-36 months, all suspended, with a probationary term of two years in exchange for a guilty plea to the felony aggravated domestic assault. The effect would be Mr. Mendez's immediate release from jail on probation, which would allow him to return to Massachusetts. Mr. Valente told Mr. Mendez of the proposal over the telephone, and told him that the effect would be that he would be deportable. He did not say that deportation was a certain consequence of such a plea with no opportunity to avoid it, nor did he propose alternative pleas that might leave an opening for avoidance of deportation. He told Mr. Mendez that his only other option was to go to trial and hope for a break in the case. Mr. Mendez wished to accept the offer. Mr. Valente counseled against it. He did not develop alternative proposals to present to the prosecutor.

Mr. Bevere testified at the hearing in this case that he might have been open to a plea agreement to a misdemeanor with a jail term, rather than a felony, but if that were under consideration he would have pursued further discussion with the complainant and more analysis of the strength of the case and ramifications of such a proposal. None of this happened, as Mr. Valente notified Mr. Bevere that Mr. Mendez accepted Mr. Bevere's first offer.

2

On June 23, 2013, Mr. Valente and Mr. Mendez met face-to-face for the first time in the holding cell at court. They were there to prepare for the change-of-plea hearing that had been scheduled as a result of Mr. Mendez's acceptance of the prosecutor's offer.

Mr. Valente did not think that the resolution was a good one. During the meeting he tried to counsel Mr. Mendez not to accept the offer, and he did so using rough language in hopes of persuading him. Mr. Mendez wanted to accept the offer. Mr. Valente had prepared in advance a typed document entitled a "Waiver" for review by Mr. Mendez if he wished to proceed with the plea. It identified the terms of the State's offer. It then stated:

> I wish to accept this plea. Mr. Valente has advised me that should I accept this plea, it would be grounds for negative immigration consequences including deportation because the charge is a crime of domestic violence and a felony. I have further been advised by Mr. Valente that even if the authorities do not attempt to deport me the consequences of this plea include rendering me ineligible to attain citizenship.

> I have reviewed this waiver with Mr. Valente and it is my wish to go forward with the proposed plea agreement despite the potential consequences including deportation or inability to attain citizenship. I have not been pressured by Mr. Valente to sign this waiver and my signature is not in exchange for any promises.

Mr. Valente went over this document slowly with Mr. Mendez, and also reviewed the terms of the plea agreement and probation conditions. Mr. Mendez signed this Waiver and swore or affirmed that it was his free act and deed before a notary public. There is no evidence that there was any discussion of the deportation issue in any further depth or detail than as contained in the Waiver document.

At the time of the change of plea, Mr. Valente was anxious because he believed that despite the fact that they had reviewed the terms of the Waiver together carefully, he believed that Mr. Mendez did not understand the consequences of the plea deal. Mr. Mendez's family members were at the court that day, but Mr. Valente did not talk with them.

Mr. Mendez pled guilty to the felony aggravated domestic assault charge that day pursuant to the plea agreement. During the plea colloquy, the Judge asked him: "Do you understand that if you're not a United States citizen, this conviction could affect your ability to remain in the country, obtain your U.S. citizenship or reenter the country?" He responded, "I understand that." Other than this question and answer, there was no other reference to his immigration status or immigration consequences of the plea.

Mr. Mendez returned to Massachusetts and was on probation. Three months later, he came to Vermont again, and as a result of further contacts with his old girlfriend he was charged in October of 2013 with a new count of domestic assault in Docket No. 1825-10-13 Rdcr, as well as violation of probation in the prior case. He was dissatisfied

3

with the public defender assigned to him and in March of 2014 he retained Mr. Valente to represent him again.

Mr. Mendez's family gave Mr. Valente the name of an immigration attorney in Massachusetts, whom he called. He learned that ICE (U.S. Immigration and Customs Enforcement) had already placed a detainer on Mr. Mendez, meaning that he was going to be deported whenever he was released from incarceration. Because of the sentence he had received as a result of the initial plea to the aggravated felony domestic assault, he was not only deportable but deportation was inevitable and nothing could be done to avoid it. Mr. Valente negotiated with Mr. Bevere that Mr. Mendez would plead to the domestic violence charge as a misdemeanor and admit to violating probation with the result that the sentence on the original felony domestic assault was changed to 15 months to serve with a concurrent sentence of 15 months plus one day. Mr. Valente did not attempt to negotiate with the State to change the initial conviction to avoid immigration consequences, and because deportation was already guaranteed because of the initial conviction, he did not attempt to negotiate a plea agreement in the new charge that would have avoided deportation.

Mr. Mendez served his sentence, and then was placed in the custody of ICE, where he remained in detention for 10 months while he sought to avoid deportation to no avail. He was deported to the Dominican Republic in November of 2015, not long before the hearing in this case. He participated in the hearing by Skype. He testified that if he had understood that it was a certainty that the plea agreement would have resulted in him being deported to a country he did not know and in which he had no family, he would not have accepted the plea.

Mr. Mendez's expert witness, Bradley Stetler, is a criminal defense attorney with over 30 years of experience in Vermont. He testified about the standard of practice to be met by an attorney under the circumstances of this case. His testimony was that Mr. Valente had not met that standard of practice, and that the deviation from it affected the outcome of the case.

He testified that the standard of practice for an attorney representing a non-citizen accused of a crime is to acquire a clear understanding of the person's immigration status; to consider a variety of potential dispositions of the criminal case and their consequences; to consult with an immigration attorney to make sure of an accurate understanding of the likely consequences of each of the various possible dispositions; and to advise the client of the consequences of potential dispositions. As applied to this case, he testified that Mr. Valente had a duty to investigate and explore possible alternatives to the State's plea offer that did not make Mr. Mendez automatically deportable but either were non-deportable offenses or else were offenses that left open a window to argue for relief from deportation before an immigration judge. His opinion is that Mr. Valente failed to do enough to investigate alternatives or attempt to negotiate a plea that would reduce the likelihood of deportation.

He testified that in this case, there were four alternatives that were not explored:

4

1) Amendment of the charge to either simple assault with a reckless *mens rea* or reckless endangerment. Convictions of these charges do not render a person deportable.
2) Pursuit of a sentence that would have preserved the opportunity for Mr. Mendez to be eligible for deportation relief. The elements of a conviction that guarantee deportation are (a) a crime of violence, and (b) a sentence of one year or more. If a sentence could be for less than a year, then the opportunity is available to avoid deportation. An important goal of the defense attorney is to keep a sentence under a year so that the person is "deportation relief eligible," which means that the opportunity is preserved to argue against deportation to an immigration judge.
3) Amendment of the charge to domestic assault with a reckless *mens rea*. There is some case law to support a determination that such a conviction is not for a crime of violence. With such a conviction, Mr. Mendez would have been able to argue that case law in seeking to avoid deportation.
4) Entry of a plea to the charge without an agreed-upon sentence. This would have provided the opportunity to make an argument to the judge to seek a sentence of less than a year in order to become deportation relief eligible. His lack of a prior criminal record, legal permanent residency status, extended family ties in the U.S. including children, and his employment were favorable factors for him in making such an argument. (These factors could also have been argued to an immigration judge with a "deportation relief eligible" conviction.)

Mr. Stetler testified that Mr. Valente's work fell below the standard of practice when he did not try to identify and negotiate for any of these alternative charges or sentences that would have had safer deportation consequences. He testified that such alternatives are viable in that it is common for pleas to be entered on reduced charges. He provided statistics showing that in Rutland over a seven-year period, it was common for cases with the same initial charge as Mr. Mendez had (130 such cases) to result in convictions for reduced charges, and 40% of them resulted in charges for simple assault, reckless endangerment, or disorderly conduct, all of which can be "deportation safe" convictions.

He also testified that Mr. Valente fell below the standard of practice when he did not inform Mr. Mendez adequately about the *certainty* that the consequence of the plea deal offered by the State was deportation. Specifically, he testified that while Mr. Valente spoke of and wrote on the Waiver form about "negative immigration consequences including deportation" and the "potential" of deportability, he did not make the consequences clear enough. He should have advised Mr. Mendez that if he came to the attention of authorities, deportation would be a definite certainty, not just a possibility, and that if that happened, at that point there would be no arguments that could be made to any authority avoid it, unlike other scenarios in which arguments can be made to an immigration judge. There would be nothing that could be done about it.

Finally, he testified that the outcome for Mr. Mendez would most likely have been different if Mr. Valente had met the required standard of practice. First, because

5

there were several alternatives, an attorney who pursued them would have had a reasonable probability of negotiating a plea that would have improved the chances of avoiding deportation. Second, the evidence at trial showed that the prosecutor would have been open to considering alternatives to the plea terms that he offered, and specifically to a misdemeanor with a long jail sentence rather than a felony. Mr. Mendez's behavior following ICE detention showed that he was willing to remain incarcerated for a lengthy period if it entailed the possibility of avoiding deportation. Third, Mr. Mendez testified that if he had truly understood that deportation would be certain as a result of accepting the State's plea offer, he would not have accepted it. Thus, if Mr. Valente had met the standard of practice identified by Mr. Stetler, it is highly likely Mr. Mendez would not have entered the plea to the charge that he did.

The State did not offer a witness on the pertinent standard of practice. The only testimony on the appropriate standard of practice was the testimony of Mr. Stetler. In its post-hearing memorandum, the State sought to discredit the testimony of both Mr. Stetler and Mr. Mendez. The State argued that the practice standard is defined by *Padilla v. Kentucky*, 559 U.S. 356, 374 (2010), in which the Court held "that counsel must inform her client whether his plea carries a *risk* of deportation" (emphasis added).

The Court finds the testimony of Mr. Stetler credible and convincing. The Court is aware that in the years since changes were made in immigration law affecting the deportation of persons with convictions, Vermont attorneys such as Mr. Valente have had no guidance from appellate decisions as to the standard of practice for effective assistance of counsel under circumstances such as this. Mr. Valente was certainly aware of the risk of deportation and to his credit he made efforts to verify the risk and make his client aware of it.

However, the Court finds Mr. Stetler's testimony as to the level of investigation, analysis, and negotiation that an attorney should pursue is not just the only such testimony offered in evidence, but is a reasonable standard to which an attorney should be held under the circumstances of a case such as this one. It is in line with the attorney's role in listening to a client's statement of his own perception of his own goal, which may be a short-term goal based on limited understanding of all consequences (e.g., get out of jail and back to work as quickly as possible and take a chance on deportation risk later), but then going further to impress very clearly and in detail on the client important risks that the client may not sufficiently appreciate but which will have a significant impact on him or her (e.g., the inevitability of deportation to a country the client does not know, far from family). Mr. Stetler's opinion and standard shows that the lawyer's role includes working within the bounds of the law and legal process to minimize a risk that is significant and also to communicate with the client in a manner that impresses upon him the true significance and possible impact on his life of the risk and available alternatives.

The State's argument that the standard is set by *Padilla*, 559 U.S. at 374, is not persuasive. The State offered no witness to testify that what Mr. Valente did was sufficient and effective assistance of counsel under the circumstances of this case, and no witness to testify that *Padilla* established a standard of practice that applies in all cases

6

regardless of varying circumstances, nor specifically that minimal information about risk of deportability is sufficient to meet an attorney's standard of practice under the circumstances. The holding in *Padilla* does not address the specifics of what a lawyer must do, but only the general principle that it is the lawyer's duty to address risk of deportation. Furthermore, the fact that court rules require the judge during a plea colloquy to flag that there are possible immigration consequences to a plea also does not mean that the language used by judges in a plea sets the standard for what a lawyer should tell a client or do on behalf of a client in representing the client.[1] There is no credible evidence of the standard of practice for attorneys under the circumstances of this case except that offered by Mr. Stetler, which the Court finds to be reasonable and persuasive.

As to Mr. Mendez's testimony at hearing, the Court appreciates the State's argument that his testimony at this point is self-serving and based on hindsight and should be looked at with skepticism. The Court has done so. Taking all the evidence into account, however, the Court nonetheless finds from the evidence that if Mr. Valente had done what Mr. Stetler described as the lawyer's role prior to June 23, 2013, there is a reasonable probability that Mr. Mendez would not have accepted the plea agreement offered by the State or entered the plea he did on that date. Similarly, the plea agreement in Docket No. 1825-10-13 Rdcr was the result of the inevitable consequences of the plea agreement in the initial case. Without the outcome in the first case, Mr. Mendez would not have entered the plea he did in the second case.

## Conclusions of Law

Post-conviction claims of ineffective assistance of counsel are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland. id.*. as interpreted by the Supreme Court of Vermont, a petitioner must first show by a preponderance of the evidence that his trial counsel's assistance "fell below an objective standard of performance informed by prevailing professional norms." *In re Hyde*, 2015 VT 106, ¶ 17 (citing *In re Plante*, 171 Vt. 310, 313 (2000)). The petitioner must then also prove by preponderance that there is "a reasonable probability that, but for counsel's errors, the proceedings would have resulted in a different outcome." *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *In re Allen*, 2014 VT 53. ¶ 20 (quoting *Strickland*, 466 U.S. at 694).

Based on the foregoing facts, the Court concludes that Petitioner has met its burden to show ineffective assistance of counsel by a preponderance of the evidence..

---

[1] The fact that the Judge's reference to risk of deportation in the plea colloquy was sufficient, as the Vermont Supreme Court ruled on direct appeal, *State v. Mendez*, 2016 VT 24 at ¶ 11, does not determine the appropriate standard of practice for an attorney working with the client as a defense attorney. The roles are different. As described above, this Court adopts the standard of practice defined by Attorney Stetler as the standard for the defense attorney.

7

In addition, Mr. Mendez, in entering his plea to the felony aggravated assault, was acting on the basis of information given to him by his lawyer that was incomplete as to what his choices were. Mr. Mendez was unaware of the other options described by Mr. Stetler because his lawyer had not told him about them. Thus, the result of the ineffective assistance of counsel was that Mr. Mendez did not have the opportunity to enter a plea that was voluntarily made on the basis of all the information he should have had. Similarly, the second plea was entered based on acceptance of the validity of the first plea.

Neither plea was made voluntarily because each was necessarily based on inadequate information. Pleas made without voluntariness cannot stand. See *In re Mossey*, 129 Vt. 133, 139 (a conviction based on a guilty plea is valid only when the plea "represents a voluntary and intelligent choice of the alternative course available to him"); see also *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) ("The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'") (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)).

Thus, Petitioner has met the burden to show by a preponderance of the evidence that if Petitioner had received the assistance of counsel required under the circumstances in both cases, there is a reasonable probability that he would not have entered the pleas he did such that the outcomes in both cases would have been different.

The Petitioner having met the burden of proof on both necessary elements of a petition for post conviction relief, the petition is granted.

## ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, Petitioner's convictions for felony aggravated domestic assault in Docket No. 811-5-13 Rdcr and for misdemeanor domestic assault in Docket No. 1825-10-13 Rdcr are hereby *vacated*.

Dated at Rutland, Vermont this 28th day of April, 2016.

Mary Miles Teachout
Mary Miles Teachout
Superior Court Judge

8